## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| STEPHEN L. BADGER | ) |
| 407 Blair Road, NW | ) |
| Vienna, VA 22180 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 1:16-cv-00483 |
| | ) |
| | ) |
| GW MEDICAL FACULTY ASSOCIATES | ) |
| 2150 Pennsylvania Avenue, NW | ) |
| Washington, DC 20037 | ) |
| | ) |
| Serve: | ) |
| | ) |
| CORPORATION SERVICE COMPANY | ) |
| 1090 Vermont Avenue, NW | ) |
| Washington, D.C. 20005 | ) |
| | ) |
| Defendant. | ) |

_____)

## COMPLAINT AND JURY DEMAND

### Preliminary Statement and Introduction

1.      This is a civil action against Defendant GW Medical Faculty Associates ("MFA")
for declaratory, injunctive, and monetary relief for injuries Plaintiff Stephen Badger ("Mr.
Badger") sustained when MFA refused to pay Mr. Badger his contractually mandated severance
payment at the time it was due.  This action arises under the common law of the District of
Columbia and the District of Columbia Wage Payment and Collection Law, as amended by the
Wage Theft Prevention Act of 2014 ("DCWPCL"), D.C. Code § 32-1301 *et seq*.

2.      Mr. Badger is a highly accomplished executive who dedicated sixteen years serving MFA as its Chief Executive Officer.  On June 24, 2015, Mr. Badger and MFA entered into a Separation Agreement, under which Mr. Badger agreed to continue working at MFA until January 4, 2016, or an earlier date to be subsequently determined by the Parties, in exchange for payment of his salary and benefits during that time, as well as a severance package.   On December 30, 2015, only two business days before Mr. Badger's official separation date from MFA, the date the severance payment was due, MFA suddenly informed Mr. Badger, for the first time, that it would not pay him that severance.  MFA attempted to justify its non-payment on the ground that Mr. Badger had supposedly stopped satisfactorily performing his obligations under the Separation Agreement sometime in the "early Fall 2015," without providing any further information to bolster that sudden claim.  MFA's position is factually unsupportable and legally frivolous, and its refusal to pay Mr. Badger his separation pay constitutes a clear breach of contract and violation of the DCWPCL.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## Parties

5.      Mr. Badger is an adult resident of the State of Virginia.  He was employed by MFA from 1999 until 2015, as its CEO.  Mr. Badger is an employee within the meaning of the DCWPCL, D.C. Code § 32-1301(2).

6.      MFA is the physician-led medical practice group of the physicians practicing at the George Washington University Hospital ("GWUH"), organized under the District of Columbia Non-Profit Corporation Act, D.C. Code § 29-401 *et seq.*  MFA conducts business and maintains an office in the District of Columbia.  MFA is an employer within the meaning of the DCWPCL, D.C. Code § 32-1301(1).

## Factual Allegations

7.      Mr. Badger served as the CEO of MFA for more than 16 years, beginning in 1999.  By the end of his tenure at MFA, he earned a salary of $828,750, as well as sizeable bonuses.  His employment agreement with MFA called for him to receive severance of one year of total compensation in the event of his separation without cause from MFA.

8.      In June 2015, three MFA Board Members – Dr. Alan Wasserman, the Chairman of the Board; Harvey Pitt, the Chairman of the Board's Compensation Committee; and Ed Phelps, another member of the Board's Compensation Committee – informed Mr. Badger that Independent Members of the Board desired new leadership in the CEO position for reasons unrelated to his performance.  At the time, the Board had yet to identify a new CEO candidate and asked Mr. Badger to stay on board through the end of the year to continue with certain job duties and help transition duties to an interim CEO.  Mr. Pitt, Dr. Wasserman, and Mr. Phelps told Mr. Badger that they would discuss and come to a consensus regarding the terms of Mr. Badger's separation, including separation benefits.  Mr. Badger agreed to this tentative plan.

9.      Throughout June 2015, Mr. Badger, Dr. Wasserman, Mr. Pitt, and Mr. Phelps discussed the severance to be paid to Mr. Badger in connection with his continued work for MFA and ultimate departure from the CEO position and consulted with several experts on healthcare executive compensation regarding that issue.  Based on these informed discussions, MFA and Mr. Badger agreed that Mr. Badger would receive, *inter alia,* a severance of approximately 18 months of pay.

10.     After agreeing to the basic terms of Mr. Badger's separation, these representatives of MFA's Board presented Mr. Badger with a separation agreement.   Mr. Badger and Dr. Wasserman, signing on behalf of MFA, executed the agreement on June 25, 2015 (the "Separation Agreement").   See Exhibit 1.  On June 30, 2015, Dr. Wasserman and Mr. Badger executed a First Amendment to the Separation Agreement amending paragraphs 1(b) and 1(c) of the Separation Agreement  (the "First Amendment").   See Exhibit 2.

11.     The Separation Agreement, as amended by the First Amendment, called for Mr. Badger to perform "Continuing Activities," *i.e.* his CEO duties, until a date agreed upon by the parties.   See Separation Agreement, Ex. 1, at ¶ 2(f); First Amendment, Ex. 2, at ¶ 2.   In exchange, MFA agreed to pay Mr. Badger his base salary and benefits through his separation date and a severance payment totaling $1,418,125 following his separation date. Id. at ¶ 3(a)-(e).

12.     The Separation Agreement, as amended by the First Amendment, provided in relevant part:

> i. Mr. Badger's employment, as in effect prior to the Separation Agreement, shall terminate no earlier than September 30, 2015, and no later than January 4, 2016.  ("Separation Date").  See First Amendment, Ex. 2, at ¶ 1.

ii.  To facilitate the orderly transition of his functions to a successor, from July 1, 2015, until the termination of the Separation Agreement, Mr. Badger will perform the same duties for MFA, with the same titles, as he did prior to the Separation Date.   ("Continuing Activities").   <u>See</u> Separation Agreement, Ex. 1, at ¶ 2(a).

iii.  Mr. Badger will continue to perform the Continuing Activities for MFA until a date to be agreed upon by the parties, which date shall be no later than the Separation Date.  <u>See</u> First Amendment, Ex. 2, at ¶2.

iv.  For his Continuing Activities, Mr. Badger shall receive a base compensation at an annual rate of $828,750 and the same non-cash benefits he received prior to the Separation Date.   <u>See</u> Separation Agreement, Ex. 1, at ¶ 2(b)-(c).

v.  If Mr. Badger satisfactorily performs Continuing Activities until a date agreed upon by the parties, he shall receive separation benefits in the total amount of $1,418,125 and payment of his employer portion of health care premiums for up to 18 months upon his separation.   ("Separation Benefits").  <u>See</u> Separation Agreement, Ex. 1, at ¶¶ 2(e) and 3(a)-(f); First Amendment, Ex. 2, at ¶ 2.

vi.  If MFA determines – for any reason other than SLB's poor performance – to terminate SLB's Continuing Activities before December 31, 2015, Mr. Badger shall nonetheless be entitled to receive the full base salary portion of the Separation Benefits set forth in §3, as if he had worked through December 31, 2015.  <u>See</u> Separation Agreement, Ex. 1, at ¶ 2(f).

13.     Following the execution of the Separation Agreement, Mr. Badger continued to satisfactorily perform his Continuing Activities, to the best of his ability and without complaint from MFA.

14.     In mid-September 2015, Dr. Wasserman told Mr. Badger that MFA desired to accelerate Mr. Badger's transition from the CEO position and end his Continuing Activities, effective September 25, 2015. Dr. Wasserman explained that the Board felt that its recent announcement of Mr. Badger's year-end departure had created a "lame duck" atmosphere that might be confusing for the staff.  As the MFA Board was nearly ready to make a job offer to an interim CEO candidate, Dr. Wasserman explained to Mr. Badger that the Board felt that transitioning Mr. Badger now would reduce the potential for confusion.  Dr. Wasserman told Mr. Badger that, after the coming week, he would no longer need to report to the office and that he could take the remainder of the year as paid leave and use the time to search for new employment on a full-time basis.

15.     At no point did Dr. Wasserman state or suggest that the Board decided to end Mr. Badger's Continuing Activities due to poor performance.  Instead, Dr. Wasserman praised Mr. Badger for the manner in which he had comported himself since executing the Separation Agreement.  He also confirmed that the transition would not affect the benefits to which Mr. Badger was entitled under the Separation Agreement, including the Separation Benefits, which Dr. Wasserman said MFA would pay.

16.     On September 21, 2015, Mr. Badger emailed Dr. Wasserman about the scope of assistance requested going forward in light of the new transition plan.  He asked Dr. Wasserman which, if any, of his job duties MFA's Board wanted him to continue.  Dr. Wasserman requested that Mr. Badger only provide reasonable assistance, as provided for in paragraph 8(a) of the

Separation Agreement, to transition his job duties, including reviewing financial reports until the interim CEO arrived.  Mr. Badger replied that he was "happy to continue reviewing financials and do anything else you need" and also agreed to meet with the incoming interim CEO to help transition duties, as also requested by Dr. Wasserman.  The next day, Mr. Badger reiterated this plan via email to MFA's Department Chair and Senior Leadership, stating, among other things, that he would be continuing to review financial data, that he would be staying current on email, and that he would be available to Dr. Wasserman on an as-needed basis.  He also stated that he was available to review items remotely via e-mail or phone calls.

17.    Mr. Badger thereafter provided reasonable assistance to transition his job duties as requested by the MFA Board.  This assistance included Mr. Badger's continued review of MFA financials, as previously requested by Dr. Wasserman.  Mr. Badger also met with MFA's new interim CEO, Roy Santarella, to transfer information to Mr. Santarella about MFA and the CEO's responsibilities.

18.    At no point did MFA express any dissatisfaction with Mr. Badger's prior performance as CEO or provision of reasonable assistance.  Indeed, on October 22, 2015, Mr. Badger, at the request of Dr. Wasserman, attended the Annual MFA Physician meeting, at which Dr. Wasserman publicly highlighted many of Mr. Badger's significant accomplishments as CEO of MFA.  At the conclusion of Dr. Wasserman's presentation, he presented Mr. Badger with an MFA Chair for his years of service and leadership as CEO.  This presentation was met with a standing ovation by all in attendance, including the CEO of GWUH and the Dean of the School of Medicine.

19.    Mr. Badger provided reasonable assistance to MFA through October, November, and December 2015, without complaint or objection from MFA.  On October 19, 2015, for

instance, Mr. Badger attended an important meeting with MFA's bankers and auditors, when MFA's Chief Financial Officer, Ken Marter, had a family emergency and was unable to attend, to help explain the data and transition the banking and auditor relationships.  During this same time period, Mr. Badger carried out other important tasks, including sending a detailed memo to members of the Board presenting information about MFA's departments, finances, ongoing projects, administrative functions, and a number of other issues; communicating with members of the Board and with Mr. Santarella about the budgeted cash flow projections and revised budget for the 2016 fiscal year; and periodically communicating with Dr. Wasserman about other MFA business matters and offering assistance as needed.

20.     In the months following the parties' execution of the Separation Agreement, MFA did not at any point allege to Mr. Badger that he had not performed his Continuing Duties; that he had failed to provide reasonable assistance as required per paragraph 8(a) of the Separation Agreement after September 25, 2015; or that his performance in carrying out these duties had been deficient.  Nor did MFA indicate to Mr. Badger that it intended to withhold his Separation Benefits or that it was even contemplating withholding his Separation Benefits, for any reason.

21.     To the contrary, MFA's conduct throughout the summer and fall of 2015 continually reinforced the view that Mr. Badger's performance under the Separation Agreement had been fully satisfactory and that MFA recognized its obligation to pay the Separation Benefits on January 4, 2016, and intended to do so.  For example, in the months following the Parties' execution of the Separation Agreement, MFA continued to pay Mr. Badger his full salary and benefits, which it could have withheld had he failed to perform the Continuing Activities or been terminated for poor performance after MFA had requested he stop performing his Continuing Activities.  Additionally, MFA also paid Mr. Badger the discretionary bonus provided for in

paragraph 3(a) of the Separation Benefits on October 15, 2015, more than two weeks after MFA requested that Mr. Badger stop performing his Continuing Activities.

22.     Similarly, in early October 2015, Mr. Badger notified Dr. Wasserman of a potential consulting offer from Sibley Hospital.  Mr. Badger indicated to Dr. Wasserman that he would forego the opportunity if necessary, if taking the position before his employment with MFA officially ended would jeopardize his separation payment under the Separation Agreement. Dr. Wasserman, in consultation with MFA's then General Counsel, John Eriksen, approved the consulting opportunity for Mr. Badger and said nothing to Mr. Badger about his Separation Benefits being in any way in jeopardy or having already been cancelled by MFA.

23.     During the final weeks of his employment, Mr. Badger corresponded with several top executives of MFA, all of whom indirectly confirmed the plan and intention for MFA to make his Separation Benefits payment on January 4, 2016.  In late November 2015, Mr. Badger corresponded with Rodney Whitmore, MFA's Chief Human Resources Officer, regarding an element of his Separation Benefits that would be paid beginning in January 2016.  Rather than inform Mr. Badger that MFA had determined that he would not receive the Separation Benefits, Mr. Whitmore communicated with him regarding details of the impending benefits payment. Additionally, on December 22, 2015, Mr. Badger emailed Mr. Whitmore and Mr. Marter, MFA's CFO, to confirm that "everything [was] all set for [his] final [separation] payment due on January 4th," in the amount of $1,418,125, as well as the proper tax treatment of the health insurance portion of the Separation Benefits.  Scheila Lowery, MFA's Director of Payroll Services, who responded since Mr. Marter was then out of the office, replied that she was "getting clarification regarding your final payment and will be in touch."  At no time did Ms. Lowery, Mr. Whitmore, Mr. Marter, or anyone else indicate to Mr. Badger that MFA was not

planning to pay his Separation Benefits or that there was any basis for MFA to withhold the Separation Benefits.

24.     Without any prior notice or warning, on December 30, 2015, only two business days before the date on which MFA had previously agreed to pay Mr. Badger his Separation Benefits, MFA suddenly notified Mr. Badger, via a letter from its attorney, that it did not intend to pay him his Separation Benefits and that it had terminated his employment effective immediately.   The letter alleged, for the first time, that Mr. Badger had failed to perform his Continuing Activities satisfactorily sometime in the "early Fall 2015," without providing any specifics, and that he therefore was not entitled to the Separation Benefits.   This was the first time that MFA had ever alleged that he had not adequately performed his Continuing Activities or that it did not intend to pay his agreed-upon Separation Benefits.

25.     Immediately after receiving this letter, Mr. Badger communicated with several members of the MFA Board, including the Board Chairman, all of whom told him that they were aware of no valid basis to withhold the Separation Benefits.   Dr. Wasserman told Mr. Badger that he was shocked by the letter, that he had received no prior notice that MFA would refuse to pay Mr. Badger's separation payment or was even contemplating such an action, and that he was aware of no valid basis for such a refusal.   Indeed, he assured Mr. Badger that the letter from MFA's attorney must have been a misunderstanding by the new outside law firm.

26.     At Dr. Wasserman's suggestion, Mr. Badger then contacted Dr. Anton Sidawy, the new chair of MFA's Board.   Dr. Sidawy told Mr. Badger that he had already spoken with Dr. Wasserman and that he agreed with Dr. Wasserman that the letter from MFA's attorney must be some sort of mistake, noting that Dr. Wasserman had told him that Mr. Badger had fulfilled all his required obligations under the Separation Agreement.   He apologized to Mr. Badger and

assured him that he and Dr. Wasserman would meet on Monday to straighten out the situation in order to ensure that Mr. Badger received his separation payments.

27.     Subsequent to his conversations with Dr. Wasserman and Dr. Sidawy, Mr. Reid, another member of the Board to whom Mr. Badger had forwarded the letter from MFA's attorney, responded by email that MFA's refusal to pay Mr. Badger his separation payment was "ridiculous."  Mr. Badger also shared a copy of MFA's letter with Blair Watters, another MFA Board member who had stepped down from that role a few weeks earlier (as well as with Robb Watters, Blair's husband and a former MFA Board member).  Ms. Watters responded back that she agreed with the assessment that MFA's new position was "obviously a breach of the agreement.  I do not believe this to be legal."  Finally, Mr. Badger also spoke with Mr. Eriksen, MFA's recently departed General Counsel, who also noted that he had not known anything about the plan to not pay Mr. Badger his Separation Benefits.

28.     MFA refused to pay Mr. Badger the Separation Benefits owed to him under his Separation Agreement.  By breaching the Separation Agreement and failing to pay wages due to Mr. Badger on January 4, 2016, MFA has caused him to suffer significant economic harm.

29.      Mr. Badger, through counsel, requested prompt payment of the wages due to Mr. Badger under the Separation Agreement, citing Defendant's refusal to pay the monies due as a blatant violation of the District of Columbia Wage Payment and Collection Law.  Defendant continues its refusal to pay Mr. Badger, citing, among other illegitimate reasons, Defendant's poor economic condition.

## COUNT I

### BREACH OF CONTRACT

30.      Paragraphs 1-29 above are hereby incorporated by reference as if set forth fully herein.

31.      MFA and Mr. Badger were parties to the Separation Agreement, executed on June 25, 2015, and modified in part by the First Amendment on June 30, 2015.

32.      In the Separation Agreement, as modified by the First Amendment, MFA agreed to pay Mr. Badger the Separation Benefits if he performed his Continuing Activities, as requested by MFA, until a date agreed upon by the parties.  MFA also agreed to pay Mr. Badger attorneys' fees and costs incurred in the event that MFA breached the Separation Agreement.

33.      The Separation Agreement further provides that if MFA determined – for any reason other than Mr. Badger's poor performance – to end his Continuing Activities before December 31, 2015, Mr. Badger shall nonetheless be entitled to payment as if he had performed all the Continuing Activities throughout the full period.

34.      Mr. Badger satisfactorily performed his Continuing Activities until September 25, 2015.  On September 25, 2015, Dr. Wasserman requested – for reasons other than Mr. Badger's poor performance – that Mr. Badger accelerate his transition and cease performing his Continuing Activities.  From September 25, 2015, until his abrupt termination on December 30, 2015, Mr. Badger thereafter provided reasonable assistance to MFA, as requested by Dr. Wasserman and others.

35.      Despite the fact that Mr. Badger satisfied his obligations under the Separation Agreement, MFA refused and failed to pay Mr. Badger the Separation Benefits to which it had

agreed in the Separation Agreement.  MFA's refusal to pay Mr. Badger the Separation Benefits owed to him under the Separation Agreement represents a breach of contract.

36.     As a direct and proximate result of MFA's breach of contract, Mr. Badger has suffered significant economic damages.

## COUNT II

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

37.     Paragraphs 1-36 above are hereby incorporated by reference as if set forth fully herein.

38.     District of Columbia law recognizes an implied covenant of good faith and fair dealing in every contract.  The implied covenant of good faith and fair dealing requires both parties to a contract to act in good faith.  A party breaches the implied covenant of good faith and fair dealing when it acts in bad faith to destroy or injure the right of the other party to receive the benefits of the contract.

39.     MFA and Mr. Badger were parties to the Separation Agreement, executed on June 25, 2015, and modified in part by the First Amendment on June 30, 2015.

40.     In the Separation Agreement, as modified by the First Amendment, MFA agreed to pay Mr. Badger the Separation Benefits if he remained employed and performed his Continuing Activities, as requested by MFA, until a date agreed upon by the parties.  MFA also agreed to pay Mr. Badger attorneys' fees and costs incurred in the event that MFA breached the Separation Agreement.

41.     From June 25, 2015 until December 30, 2015, Mr. Badger fulfilled his obligations under the Separation Agreement.

42.     On December 30, 2015, two business days before Mr. Badger's Separation Benefits were due under the contract, MFA suddenly terminated Mr. Badger's employment without prior warning.

43.     MFA's abrupt and baseless termination of Mr. Badger was undertaken in bad faith to interfere with Mr. Badger's ability to perform his duties under the contract.

44.     By acting intentionally and in bad faith to destroy Mr. Badger's right to receive the benefit of the contract, MFA breached the implied covenant of good faith and fair dealing inherent in the Parties' contract.

45.     As a direct and proximate result of MFA's breach of the implied covenant of good faith and fair dealing, Mr. Badger has suffered significant economic damages.

## COUNT III

### VIOLATION OF THE DISTRICT OF COLUMBIA WAGE PAYMENT AND COLLECTION LAW

46.     Paragraphs 1-45 above are hereby incorporated by reference as if set forth fully herein.

47.     The District of Columbia Wage Payment and Collection Law, as amended by the Wage Theft Prevention Act of 2014 ("DCWPCL" or "the Act"), requires an employer to pay its employees all wages owed at the time they are due.  D.C. Code § 32-1301(3).

48.     MFA is an employer under the Act.  Id. at § 32-1301(1).  Mr. Badger is an employee under the Act.  Id. at § 32-1301(2).

49.     Under the DCWPCL, wages include "all monetary compensation owed by an employer," including but not limited to "other remuneration promised or owed … pursuant to a contract for employment, whether written or oral" or pursuant to any other "contract between an employer and another person or entity."  Id. at § 32-1301(3)(E)(i)-(ii).

14

50.     An employer violates the DCWPCL if it does not pay an employee wages owed at the time they are due.  Id. at §32-1302.

51.     By refusing to pay Mr. Badger the Separation Benefits, MFA failed to make a sizeable wage payment that it owed to Mr. Badger.

52.     Mr. Badger was injured as a direct and proximate cause of MFA's refusal to pay him wages owed to him at the time they were due.

### Requested Relief

WHEREFORE, Plaintiff demands a trial by jury and prays this Court for the following relief:

53.     Enter a judgment in Mr. Badger's favor and against MFA for breach of contract and violation of the DCWPCL;

54.     Award Mr. Badger $1,418,125, plus interest, and COBRA payments for the period January 2016 through March 2016, due to him under his Separation Agreement and as wages under the DCWPCL;

55.     Award Mr. Badger an additional amount as liquidated damages of three times the amount owed in unpaid wages and COBRA payments under the DCWPCL, in the amount of $4,254,375 and three times the amount of COBRA payments, plus interest;

56.     Award Mr. Badger reasonable attorneys' fees, litigation expenses, and costs.

Respectfully submitted,

_____
Debra S. Katz (D.C. Dist. Ct. No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Ph:      (202) 299-1140
Fax:     (202) 299-1148
Email: katz@kmblegal.com


_____
Avi L. Kumin (D.C. Dist. Ct. No. 475761)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Ph:      (202) 299-1140
Fax:     (202) 299-1148
Email: kumin@kmblegal.com


*Attorneys for Plaintiff Stephen Badger*


Dated:    March 11, 2016